# United States Court of Appeals for the Federal Circuit

---

**MILITARY-VETERANS ADVOCACY INC.,**
*Petitioner*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2020-2086

---

Petition for review pursuant to 38 U.S.C. Section 502.

---

Decided:  June 17, 2022

---

JAMES ANGLIN FLYNN, Orrick, Herrington & Sutcliffe LLP, Washington, DC, argued for petitioner.  Also represented by MELANIE L. BOSTWICK; JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by BRIAN M. BOYNTON, ERIC P. BRUSKIN, MARTIN F. HOCKEY, JR.; BRIAN D. GRIFFIN, JONATHAN KRISCH, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

SASHA RAO, Sterne Kessler Goldstein Fox PLLC,

Washington, DC,   for amicus curiae Association of the United States Navy.  Also represented by KRISTINA CAGGIANO KELLY, MICHAEL E. JOFFRE.

STANLEY JOSEPH PANIKOWSKI, III, DLA Piper LLP (US), San Diego, CA, for amicus curiae Therese M. Terlaje.

―――――――――――

Before NEWMAN, PROST, and CUNNINGHAM, *Circuit Judges*.

PROST, *Circuit Judge*.

Military-Veterans Advocacy Inc. ("MVA") petitioned the Secretary of Veterans Affairs ("VA")[1] to issue a rule that would presume herbicide exposure for veterans who served in Guam or Johnston Island during specified periods. The VA denied MVA's rulemaking petition. MVA now petitions this court under 38 U.S.C. § 502 to set aside the VA's denial and remand for rulemaking. We deny the petition.

BACKGROUND

I

The U.S. military sprayed over 17 million gallons of herbicides over the Republic of Vietnam during the Vietnam War. Dubbed "Operation Ranch Hand," this operation had two main objectives: (1) defoliate trees and plants to improve visibility for further military operations, and (2) destroy enemy food supplies.

―――――――――――

[1]    Because neither party identifies any distinction between the Secretary of Veterans Affairs and the Department of Veterans Affairs that is relevant to the issues presented here, this opinion refers to the two interchangeably as the VA.

Agent Orange was the primary herbicide used in Operation Ranch Hand. It consisted of an undiluted mixture of equal parts 2,4-dichlorophenoxyacetic acid ("2,4-D") and the *n*-butyl ester of 2,4,5-trichlorophenoxyacetic acid ("2,4,5-T"). The latter ingredient, 2,4,5-T, includes a highly toxic contaminant, 2,3,7,8-tetrachlorodibenzo-*p*-dioxin ("TCDD" or "dioxin").

Concerns about the health effects of veterans' exposure to Agent Orange led Congress to pass the Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11. For veterans who "served in the Republic of Vietnam" during a specified period, the Act presumes exposure to an herbicide agent[2] containing 2,4-D or dioxin. 38 U.S.C. § 1116(f). It also presumes (for those same veterans) service connection for certain diseases associated with herbicide-agent exposure, such as non-Hodgkin's lymphoma and soft-tissue sarcoma. *Id.* § 1116(a)(2).

The VA has since issued regulations extending similar presumptions to other groups of veterans. For example, in light of Department of Defense ("DoD") information that herbicides were applied near the Korean demilitarized zone ("DMZ"), the VA presumes herbicide-agent exposure for veterans who served during a specified period "in a unit that, as determined by the [DoD], operated in or near the Korean DMZ in an area in which herbicides are known to

---

[2]    The Agent Orange Act defines "herbicide agent" as "a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975." 38 U.S.C. § 1116(a)(3). VA regulations mirror this statutory definition and further provide that herbicide agents are "specifically: 2,4-D; 2,4,5-T and its contaminant TCDD; cacodylic acid; and picloram." 38 C.F.R. § 3.307(a)(6)(i).

have been applied during that period."[3]    38 C.F.R.
§ 3.307(a)(6)(iv); *see* Herbicide Exposure and Veterans
With Covered Service in Korea, 74 Fed. Reg. 36,640,
36,641, 36,646 (July 24, 2009) (proposed rule).  Likewise,
an Institute of Medicine report led the VA to presume herb-
icide-agent exposure for veterans who "regularly and re-
peatedly operated, maintained, or served onboard C-123
aircraft known to have been used to spray an herbicide
agent during the Vietnam era."  38 C.F.R. § 3.307(a)(6)(v);
*see* Presumption of Herbicide Exposure and Presumption
of Disability During Service for Reservists Presumed Ex-
posed to Herbicide, 80 Fed. Reg. 35,246, 35,246, 35,248–49
(June 19, 2015) (interim final rule).

II

In 2017, the Armed Services Committee of the U.S.
House of Representatives expressed concern that addi-
tional exposures to Agent Orange may have occurred in
Guam.  H.R. Rep. No. 115-200, at 113 (2017).  It therefore
directed the U.S. Comptroller General to review and sub-
mit a report on the issue.  *Id.* at 114.  The U.S. Governmen-
tal Accountability Office ("GAO") submitted its report in
2018.  J.A. 2164–266.

The GAO report began by characterizing Agent Orange
as a "tactical" herbicide—i.e., one "developed specifically by
[the] DoD to be used in combat operations"—as distin-
guished from a "commercial" herbicide.  J.A. 2169 & n.1;
*see* J.A. 2178–80.  Although the report acknowledged that
tactical and commercial herbicides might have shared
some of the same chemical compounds, *see* J.A. 2179, it
noted differences between the two.  For example, according

---

[3]    Congress later did similarly via statute.  *See* Blue
Water Navy Vietnam Veterans Act of 2019, Pub. L.
No. 116-23, sec. 3(a), 133 Stat. 966, 969 (codified at
38 U.S.C. § 1116B).

to the report, tactical herbicides were (1) centrally managed by the military; (2) unauthorized for domestic use; and (3) undiluted and sprayed aerially. J.A. 2176 n.21, 2178–79; *see also* J.A. 1592 (VA-commissioned report noting that, "[u]nlike civilian applications of the components contained in Agent Orange[,] which are diluted in oil and water, Agent Orange was sprayed undiluted in Vietnam"). Commercial herbicides, by contrast, were (1) widely available worldwide for vegetation management; (2) approved for use by all federal agencies; and (3) diluted and sprayed by hand or truck when used on military installations. J.A. 2178–79.

The GAO report then examined the extent of the government's information concerning the procurement, distribution, storage, use, and disposition of Agent Orange in Guam. *See* J.A. 2170; *see also* J.A. 2225–34 (Appendix I identifying objectives, scope, and methodology). Recognizing that ships from the continental United States carried most of the tactical herbicides supporting U.S. military operations in Vietnam, the GAO obtained the available logbooks for 152 of the 158 identified voyages that transported Agent Orange to Southeast Asia.[4] J.A. 2195 (noting further that, for three of the six voyages for which logbooks could not be located, the GAO obtained copies of the vessels' shipping articles). The report identified just four voyages involving a stop in Guam; one ship stopped on the way to Vietnam, and the other three stopped on the way back to the United States. J.A. 2197–98. After reviewing available

---

[4]    The GAO report focused primarily on Agent Orange, as opposed to other tactical herbicides (e.g., Agents Pink, Purple, Green, Blue, and White). *See* J.A. 2169 n.1; *see also* J.A. 2194 n.57 (observing that there are limited shipment records available for Agents Pink, Green, and Purple and that Agents Blue and White did "not contain n-butyl 2,4,5-T").

shipment documentation, the GAO "found no evidence indicating that Agent Orange or any other tactical herbicides were offloaded" from those ships. J.A. 2197; *see* J.A. 2198–200 (noting that each stop appeared related to offloading injured crew members).

The GAO also recounted veteran statements alleging Agent Orange use in Guam, but it nonetheless "could not substantiate the presence or use of Agent Orange or other tactical herbicides" there. J.A. 2203. Rather, these allegations were consistent with DoD information indicating that commercial herbicides were available in Guam for controlling vegetation. *See* J.A. 2203; *see also* J.A. 2188 ("[W]hile [DoD] documents identify the use of commercial herbicides on Guam, they do not identify the use of tactical herbicides there."); J.A. 2201 ("Available records show that [the DoD] stored and used commercial herbicides on Guam, possibly including those containing n-butyl 2,4,5-T, during the 1960s and 1970s, but documents do not indicate the use of tactical herbicides on Guam.").

The GAO did conclude, however, that a DoD list on the VA's website that identified herbicide-testing and -storage locations outside of Vietnam was inaccurate and incomplete. The report included several recommendations to the DoD and VA related to updating and clarifying the list. After receiving the GAO report, the DoD conducted an 18-month review of records to update the list. The DoD and VA also developed joint criteria for what should be listed as a location where tactical herbicides were used, tested, or stored. Those joint criteria required that (1) an official record existed (e.g., a government report, unit history, shipping log, or contract); and (2) the location was a DoD installation, land under DoD jurisdiction, or a non-DoD location where service members were present during use, testing, storage, or transportation. The DoD's record search and these joint criteria resulted in an updated list, which identified 24 locations outside of Vietnam where tactical herbicides were used, tested, or stored. J.A. 2267–82.

Such locations included Cambodia, Canada, India, Johnston Island,[5] Korea, and Laos—but not Guam.

## III

In December 2018, MVA petitioned the VA to issue rules presuming herbicide-agent exposure for veterans who served in Guam or Johnston Island during specified periods.[6] J.A. 10–12. As to Guam, MVA's petition included photographs and four veterans' affidavits in support. The photographs showed browned-out vegetation that purportedly evidenced herbicide spraying in Guam, *see* J.A. 13, while the affidavits recounted the veterans' Vietnam-era service in Guam and attested to their being aware of, witnessing, or conducting herbicide spraying there, J.A. 14–19. As to Johnston Island, MVA noted that it was a storage site for Agent Orange drums between 1972 and 1977. MVA asserted that corrosion caused the drums to leak during that storage period and that military personnel stationed there were exposed to that leakage. J.A. 11.

When discussing Guam, MVA's rulemaking petition discouraged distinguishing between tactical and commercial herbicides. According to MVA, because commercial herbicides contained 2,4,5-T, and because exposure to

---

[5]    Johnston Island is the largest island in the Johnston Atoll. This opinion's references to Johnston Island contemplate both the island and the atoll.

[6]    In later supplements to its petition, MVA mentioned including American Samoa along with Guam and Johnston Island. *See* J.A. 2087; J.A. 2134. The VA denied MVA's petition as to American Samoa, J.A. 9, and MVA's opening brief to this court did not include any argument concerning American Samoa that was separate and distinct from its arguments concerning Guam or Johnston Island. *See* Pet'r's Br. 17 n.1. We therefore do not address American Samoa separately.

herbicides with that compound can suffice to establish service connection for certain diseases, "[w]hether that exposure came from Agent Orange, another tactical herbicide[,] or a commercial herbicide is of no moment." *See* J.A. 10.

MVA supplemented its rulemaking petition twice in December 2019. Those supplements referenced, among other things, a report concerning testing of soil taken from Guam in 2018, which found "only trace amounts" of 2,4-D and 2,4,5-T. J.A. 2134 (citing J.A. 2135–41).

In May 2020, the VA denied MVA's rulemaking petition. MVA sent the VA a letter responding to that denial in June 2020, J.A. 2149–53, and it petitioned this court for review in July 2020. In November 2020, the VA sought a remand so that it could consider the aforementioned photographs and veterans' affidavits, which it had not considered before rendering its May 2020 denial. We granted the VA's request and remanded so that it could consider these materials, and we ordered the VA to render a new decision on MVA's rulemaking petition no later than February 19, 2021. Order (Dec. 21, 2020), ECF No. 16.

On remand, the VA again denied MVA's rulemaking petition. J.A. 1–9. As to Guam, the VA cited the DoD's record search and noted that the DoD "found no evidence of Agent Orange or other tactical herbicides on Guam." J.A. 2. It also cited the GAO report, which said that the GAO "found no evidence indicating that Agent Orange or any other tactical herbicides were offloaded . . . or used in . . . Guam." J.A. 2 (alteration in original) (quoting J.A. 2197).

The VA further observed that, "[t]o the extent that trace levels of 2,4-D and 2,4,5-T have been found on Guam, that would be expected," as commercial herbicides containing these compounds were commonly used during the Vietnam era (in Guam and elsewhere) for standard vegetation and weed control. *See* J.A. 2–3 ("Thus, the presence of trace levels of 2,4-D and 2,4,5-T cannot be construed

as evidence of the presence of Agent Orange or tactical herbicides in such locations."). Likewise, it explained that any high concentration of dioxin "would be expected" at, for example, a firefighting training area in Guam because dioxin can "be released into the environment through forest fires, burning of trash or waste, or industrial activities." J.A. 6 (concluding that basing presumptions on dioxin levels in a firefighting training area would implicate issues of "false positives").

The VA also addressed MVA's argument against distinguishing between tactical and commercial herbicides. Although MVA had argued that such a distinction was "of no moment," the VA disagreed—at least insofar as extending presumptions was concerned:

> It is clear that Congress did not enact the Agent Orange Act . . . and codify presumptive service connection for veterans who served in the Republic of Vietnam because of commercial herbicides commonly used worldwide for standard vegetation and weed control. Rather, Congress established presumptive service connection . . . *due to the unique nature of the application and exposure in that country.*

J.A. 3 (emphasis added) (cleaned up); *id.* ("[T]he primary purpose of the [Agent Orange Act] was to acknowledge the *uniquely high risk of exposure*, and corresponding risk to [s]ervice members' health, *posed by large-scale application of herbicides for the deliberate purpose of eliminating plant cover for the enemy*, as was done in the Republic of Vietnam." (emphasis added)). The VA summarized its view of this issue:

> Though [MVA] asserted that the spraying method and the commercial-tactical distinction is of no real import . . . , Congress, in the Agent Orange Act, was addressing the question of when to *presume* the service connection of certain diseases, and the

> spraying method and the extensive scale of appli-
> cation in Vietnam were critical factors in the deci-
> sion to authorize a presumption—solely for
> veterans who served in Vietnam. The fact that vet-
> erans serving in Guam supported the effort in Vi-
> etnam or may have worked with vehicles that
> traveled to or from Vietnam . . . does not place
> these veterans in the same position as veterans
> who served in Vietnam insofar as a *presumption* is
> concerned.

J.A. 4 (emphasis in original) (cleaned up); *see id.* (reasoning that the Korean-DMZ and C-123-aircraft scenarios covered by regulation "all directly relate to the deliberate applica-tion of herbicides for a tactical military purpose on a broad scale" and that the exposure scenario in Guam was "not comparable").

The VA then considered the photographs and veterans' affidavits MVA submitted with its petition, but those ma-terials did not persuade it to issue a presumption-confer-ring rule for Guam. J.A. 4–5. For example, the VA observed that "[w]hile the degradation of foliage and vege-tation—resulting in the 'brown-out' effect shown in the photographs—would be expected from the use of commer-cial herbicides, which were routinely used in Guam for veg-etation management, it would be pure speculation to opine as to the cause of the 'brown-out' effect." J.A. 5. In the VA's view, the photographs did "not provide sufficient evidence of the testing, use, storage, or transportation of Agent Or-ange or other tactical herbicides in Guam so as to warrant a presumption of exposure for all [v]eterans serving in Guam" during the relevant period. J.A. 5. And although the VA considered each of the four veterans' affidavits, they did "not alter this conclusion." J.A. 5.

As to Johnston Island, the VA acknowledged that it was a storage site for Agent Orange drums between 1972 and 1977 and that some leakage occurred. J.A. 7. But it

noted that (1) civilian contractors, not military personnel, were responsible for storage-related activities; (2) procedures existed for those contractors to shower separately and change into clean clothing before entering certain other areas of the island; (3) those contractors screened the entire inventory daily for leaks and performed de-drumming activities as necessary; and (4) the storage area was fenced and off-limits from a distance. J.A. 7. The VA also noted that the storage site's floor consisted of "densely compacted coral," which would have bound any leaked herbicide, thus "providing little opportunity for the herbicide to become airborne." J.A. 8. And while the VA recognized that contemporaneous independent monitors found concentrations of 2,4-D and 2,4,5-T in ambient air and water samples, it noted that those monitors concluded that any exposure was "well below permissible levels." J.A. 8 (citing J.A. 3319–20). Accordingly, the VA decided not to issue a presumption-conferring rule for Johnston Island, either.

MVA petitions this court to review the VA's denial of MVA's rulemaking petition. We have jurisdiction under 38 U.S.C. § 502.

## DISCUSSION

We review the VA's denial of a rulemaking petition to determine whether the denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Serv. Women's Action Network v. Sec'y of Veterans Affs.*, 815 F.3d 1369, 1374 (Fed. Cir. 2016). This "highly deferential" standard is "rendered even more deferential by the treatment accorded by the courts to an agency's rulemaking authority." *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1353 (Fed. Cir. 2011); *see also Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4–5 (D.C. Cir. 1987) (observing that arbitrary-and-capricious review "encompasses a range of levels of deference to the agency" and that "an agency's refusal to institute rulemaking proceedings is at the high end of the range").

When, as here, a proposed rulemaking "pertains to a matter of policy within the agency's expertise and discretion," our scope of review is "narrow," limited to "ensuring that the agency has adequately explained the facts and policy concerns it relied on and to satisfy ourselves that those facts have some basis in the record." *Serv. Women's Action Network*, 815 F.3d at 1374 (cleaned up). In other words, we ask "whether the agency employed reasoned decisionmaking in rejecting the petition." *Id.* (cleaned up). Overturning an agency's judgment not to institute rulemaking is appropriate in only the "rarest and most compelling of circumstances." *Id.* at 1375 (cleaned up).

MVA advances two main arguments in its petition for review. First, it argues that the VA's rulemaking denial was "contrary to law" for resting on an impermissible interpretation of the Agent Orange Act. *E.g.*, Pet'r's Br. 21; *see* 5 U.S.C. § 706(2)(A) (requiring a reviewing court to set aside agency action "otherwise not in accordance with law"). Second, it argues that the denial "lacked a rational basis in this record" and was therefore arbitrary and capricious. Pet'r's Br. 54. We address each argument in turn.

I

MVA styles its first argument as one of statutory interpretation. It says that, in denying the petition as to Guam, the VA misinterpreted the Agent Orange Act as applying only to tactical herbicides—not commercial ones. Pet'r's Br. 30 ("In [the] VA's view, the Agent Orange Act applies only to so-called tactical herbicides . . . . [This] interpretation of the Act fails at every stage of a traditional statutory-interpretation analysis."). According to MVA, the Act's scope depends instead on an herbicide's chemical composition, aspects of which were common to both tactical and commercial herbicides. *See* Pet'r's Br. 31–32.

MVA's statutory-interpretation argument is simply beside the point. The Agent Orange Act does not give presumptions to anyone other than those who "served in the

Republic of Vietnam"—nor does it require the VA to do so. It does, however, provide a decent example reflecting the kinds of circumstances that have merited presumptions in the past. The VA looked to those circumstances, compared them to Guam's, found them not comparable, and ultimately declined to exercise rulemaking authority to extend a presumption to Guam. That comparison and judgment did not rest on any misconception about what the Act *itself* does.

The tactical-commercial distinction in particular arose when the VA considered the circumstances that led Congress to pass the Agent Orange Act in the first place. The VA reasoned that Congress gave veterans who "served in the Republic of Vietnam" presumptions because of "the uniquely high risk of exposure . . . posed by large-scale application of herbicides for the deliberate purpose of eliminating plant cover for the enemy," as occurred in that country—not "because of commercial herbicides commonly used worldwide for standard vegetation and weed control." J.A. 3. And, when comparing the nature and extent of herbicide activity in Vietnam (and in the other scenarios where the VA has extended presumptions) to that in Guam, the VA determined that the activity in Guam was not comparable and therefore did not warrant exercising rulemaking authority to extend a presumption there. *See* J.A. 3–7. Thus, even assuming (for argument's sake) that the Act *itself* does not distinguish between tactical and commercial herbicides when giving *its* presumptions, the VA did not rest its denial on any contrary understanding of the Act. Rather, it rested its denial on the view that Congress gave those presumptions because it was concerned about the spraying of millions of gallons of tactical

herbicides—and that Guam did not present comparable circumstances.[7]

MVA relies on *Massachusetts v. EPA*, 549 U.S. 497 (2007), to support its argument. But that case only highlights the difference between legal errors requiring judicial correction and what the VA did here. In *Massachusetts*, several organizations filed a rulemaking petition asking the EPA to regulate greenhouse-gas emissions under the Clean Air Act. *Id.* at 510. The EPA denied the petition, reasoning that (1) it lacked statutory authority to regulate greenhouse-gas emissions; and (2) even if it had such authority, doing so would be unwise because it would conflict with other administration priorities. *Id.* at 511, 528. The Supreme Court held that each justification was contrary to statute. As to the first, the Court interpreted the Clean Air Act as "unambiguous[ly]" supplying the EPA with the authority it professed to lack. *Id.* at 528–29, 532. As to the second, the Court held that the statute required certain things of the EPA before it could decline to regulate and that the EPA had not done those things. *Id.* at 533 (observing that the "EPA has refused to comply with [a] clear statutory command"). Because the EPA rested its denial on a statutory misinterpretation and reasons that failed to comply with what the statute required, the Court remanded to the EPA for further proceedings. *Id.* at 535.

---

[7]    MVA makes a similar argument with respect to a VA regulation, 38 C.F.R. § 3.307, saying that it doesn't distinguish between tactical and commercial herbicides. Pet'r's Br. 42–44. But this argument fails for similar reasons—namely: (1) the VA did not rest its decision on a contrary understanding; and (2) § 3.307 presumes herbicide-agent exposure *only* for veterans who served in specific circumstances involving herbicide activity that the VA determined was not comparable to that in Guam.

MVA identifies no analogous potential error in this case.  For example, the VA's denial did not claim that the VA lacked *authority* to grant the petition.  And although MVA argues that the VA's denial was "not in accordance with law" under 5 U.S.C. § 706(2)(A), it does not demonstrate how the denial failed to comply with any particular legal *requirement*.  In sum, MVA has not shown that the VA's decision was contrary to law.

## II

MVA's second argument concerns how the VA weighed the evidence before it.  According to MVA, the VA's denial "lacked a rational basis in this record" and was therefore arbitrary and capricious.  Pet'r's Br. 54.  We are unpersuaded.

As to Guam, MVA's primary contention is that the VA erred by relying on the GAO's and DoD's findings of "no evidence" of tactical herbicides there because those findings rested on the *absence* of official records documenting as much.  *See* Pet'r's Br. 54–56.  MVA argues that the absence of official records is probative only if there is some basis for believing that records would have been kept, and it observes that the military generally kept no records of "small-scale" spraying around American bases.  But the VA was not merely determining whether "small-scale" spraying occurred in Guam; it was determining whether the nature and extent of herbicide activity in Guam "warrant[ed] a presumption of exposure for all [v]eterans" who served there during the relevant period.  J.A. 5.  And MVA has not convinced us that, in making *that* determination, it was arbitrary (or capricious, or irrational) for the VA to rely on the GAO's and DoD's no-evidence findings.

MVA's other evidence-weighing arguments are also unconvincing.  For example, MVA points to the four veteran affidavits it submitted and says that the VA "erred in rejecting" them.  Pet'r's Br. 59.  But the VA explicitly considered them and found that they did "not alter [its]

conclusion" that the record lacked sufficient evidence "so as to warrant a presumption of exposure for *all [v]eterans serving in Guam*" during the relevant period. *See* J.A. 5–6 (emphasis added).[8] In denying the petition, the VA emphasized the "extensive nature" of the DoD's record search as well as the GAO's investigation and report. J.A. 6–7. Nothing in these affidavits leads us to conclude that the VA's giving more weight to the DoD's and GAO's findings—and ultimately deciding not to issue a broadly applicable, presumption-conferring rule—was arbitrary or capricious.

In a similar vein, MVA says that the VA improperly "trivialize[d]" soil testing data as showing only trace levels of 2,4-D and 2,4,5-T because finding even trace levels today is remarkable (given the passage of time, environmental degradation, and alleged shortcomings in the testing process). Pet'r's Br. 63. But the VA found that such trace levels would be expected because commercial herbicides containing the same chemical compounds were used in Guam. J.A. 2–3. The VA likewise explained that any high concentration of dioxin in, for example, a firefighting training area in Guam would be expected since dioxin can "be released into the environment through forest fires, burning of trash or waste, or industrial activities." J.A. 6; *see also* J.A. 2215 (GAO report observing that "there are multiple sources of dioxin[], . . . and the specific source of dioxin contamination is difficult to identify").

Again, our scope of review is "narrow"; we ask only whether the VA "employed reasoned decisionmaking in rejecting the petition." *Serv. Women's Action Network*, 815 F.3d at 1374 (cleaned up). The VA did so here. It had evidence bearing on the nature and extent of herbicide

---

[8] The VA stressed that its decision not to issue a presumption-conferring rule does not foreclose individual veterans from proving herbicide-agent exposure in the normal course of filing a benefits claim. J.A. 6.

activity in Guam, and it determined that the evidence did not warrant presuming exposure for every single veteran who served in Guam during the relevant period. This determination—and the VA's explanation for it—was more than adequate to survive our narrow, highly deferential review.

As to Johnston Island, MVA's critiques of the VA's reasoning likewise do not persuade us that its denial was arbitrary or capricious. For example, MVA challenges the VA's rationale that civilian contractors, not military personnel, were responsible for activities concerning the storage of Agent Orange drums. According to MVA, cross-contamination occurred because those civilians showered and ate in the same facilities as military personnel. *See* Pet'r's Br. 64; J.A. 2152. But the VA considered this argument and found that MVA's support for it was "not persuasive." J.A. 8 (referencing J.A. 2159–60). Nothing in MVA's petition for review convinces us that this assessment was arbitrary or capricious. MVA also challenges the VA's rationale concerning the separate-showering and clean-clothing procedures that existed; it says that the evidence the VA relied on for that rationale "suggests" that those procedures existed for only a limited period. Pet'r's Br. 65 (citing J.A. 3407–10, 3447). MVA's argument on this score, however, amounts to little more than speculation. And, particularly in view of MVA's own lack of support for its cross-contamination theory, this argument hardly demonstrates that the VA's reliance on this evidence was irrational—much less that its overall decision on Johnston Island was arbitrary or capricious.

Finally, MVA argues that test samples from Johnston Island undermine the VA's finding that the isolation of the Agent Orange drums protected veterans. Pet'r's Br. 64. But, as the VA observed in its denial, the contemporaneous testing that MVA alludes to showed exposure to 2,4-D and 2,4,5-T that was "well below permissible levels." J.A. 8 (citing J.A. 3320 ("Concentrations of 2,4-D and 2,4,5-T found

in the ambient air and water samples were minimal. . . . [E]xposure of workers to airborne 2,4-D and 2,4,5-T w[as] well below permiss[i]ble levels.")); *see also* J.A. 3468 ("No samples were in violation of currently accepted drinking water standards . . . .").

Like its arguments concerning Guam, MVA's arguments concerning Johnston Island simply do not overcome our narrow, highly deferential standard of review.

## CONCLUSION

We have considered MVA's remaining arguments but find them unpersuasive. For the foregoing reasons, we deny MVA's petition for review.

## **DENIED**

### COSTS

No costs.